**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 19 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES JOSEPH WIRSCHING,

       Plaintiff-Appellant,

       v.

STATE OF COLORADO; BILL
OWENS, GOVERNOR; and the
COLORADO DEPARTMENT OF
CORRECTIONS AND ALL AGENTS
THEREOF,

       Defendants-Appellees.

No. 00-1437

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 98-D-1857)**

---

Robert Foster, University of Denver College of Law, Denver, Colorado, (Stephen Cribari and Megan Curtis, University of Denver College of Law, with him on the briefs) for the Plaintiff-Appellant.

Paul S. Sanzo, First Assistant Attorney General, State of Colorado (Ken Salazar, Attorney General of Colorado and Joseph P. Sanchez, Assistant Attorney General, with him on the briefs), for the Defendants-Appellees.

Before **HENRY** and **McKAY** , Circuit Judges, and   **OBERDORFER,**  Senior District Judge. *

**HENRY,**  Circuit Judge.

Charles Joseph Wirsching appeals the district court's order granting summary judgment against him and in favor of the defendants on his 42 U.S.C. § 1983 civil rights claim.  Mr. Wirsching, who until April 25, 2003 was incarcerated by the Colorado Department of Corrections (CDOC) on a conviction for sexual assault of a minor, alleges that CDOC officials violated his constitutional rights by directing him to participate in a sexual offender treatment program requiring him to admit that he had committed the assault and by imposing certain adverse consequences upon him when he refused to participate. In particular, Mr. Wirsching contends that the CDOC officials' refusal to allow visitation with his minor child violated the First and Fourteenth Amendments.  He further contends that, by depriving him of opportunity to earn good time credits at the higher rate available to prisoners who participated in the treatment program, CDOC officials violated the Fifth Amendment's prohibition against compelling self-incriminating testimony.  Mr. Wirsching also asserts that CDOC officials

* The Honorable Louis F. Oberdorfer, United States Senior District Judge for the District of Columbia, sitting by designation.

violated the Double Jeopardy Clause of the Fifth Amendment as well as the Eighth Amendment, Ninth Amendment, and the Due Process and Equal Protection clauses of the Fourteenth Amendment.

We begin our analysis by considering two threshold issues: (1) whether Mr. Wirsching's release from prison renders his claims moot; and (2) whether Mr. Wirsching has waived the right to appeal by failing to object to the magistrate's recommendation to enter summary judgment against him. As to the first issue, we conclude that Mr. Wirsching's release from prison moots his claims for declaratory and injunctive relief but not his claims for damages. As to the second issue, we conclude that in spite of Mr. Wirsching's failure to object to the magistrate's report and recommendation, the interests of justice warrant our consideration of the merits of this appeal.

On the merits of Mr. Wirsching's damages claims, we conclude that the district court properly granted summary judgment to the defendant CDOC officials. In particular, with regard to Mr. Wirsching's challenge to the denial of visitation with his minor child, we hold that Mr. Wirsching has failed to establish that prison officials violated his rights under the First and Fourteenth Amendments. We base that conclusion primarily upon the deference we afford to prison administrators in these matters, see Turner v. Safely, 482 U.S. 78, 89 (1987), as well as the evidence offered by CDOC officials in support of the policy

of restricting Mr. Wirsching's visitation privileges. As to Mr. Wirsching's Fifth Amendment compulsion claim, we apply the Supreme Court's decision in McKune v. Lile, 536 U.S. 24 (2002) and conclude that the consequences of Mr. Wirsching's refusal to admit that he had committed a sexual assault were not so severe as to likely compel him to be a witness against himself. Finally, we hold that Mr. Wirsching's remaining claims also lack merit.

## I. BACKGROUND

The relevant facts are not in dispute. In 1997, Mr. Wirsching pleaded guilty in the District Court of El Paso County, Colorado to a charge of attempted sexual assault of a child. The court sentenced Mr. Wirsching to eight years' incarceration. Mr. Wirsching had previously been convicted of second-degree assault.

The Colorado Department of Corrections has a treatment program for sex offenders. Following Mr. Wirsching's incarceration, prison staff recommended that he participate in the program. One of the requirements for participation is that the inmate admit that he has engaged in the conduct that led to his classification as a sex offender.[2] Mr. Wirsching refused to admit that he had

---

[2] See Rec. doc. 28, attach. 2 (CDOC Reg. No. 700-19 ¶ IV(F)(3)(4) (requiring prisoner's participating in the treatment program to "admit to sexually
(continued...)

engaged in the sexual assault of which he had been convicted. As a result, prison officials did not admit him into the treatment program.

CDOC regulations provide that inmates who refuse to participate in labor, educational, or work programs, or who refuse to undergo recommended treatment programs are placed on Restricted Privileges Status. Here, that status affected Mr. Wirsching as follows: (1) he could not have a television or a radio in his cell; (2) he could not use tobacco; (3) he had no canteen privileges; (4) certain personal property was removed from his cell; (5) he could not engage in recreation with other prisoners; and (6) he was required to wear orange pants.

Mr. Wirsching's refusal to participate in the treatment program also affected his opportunity to earn good time credits. Under a Colorado statute, inmates are entitled to earn these credits at the highest rate (ten days for each month of incarceration) only if they "progress towards the goals and programs established by the Colorado diagnostic program." Col. Rev. Stat. § 17-22.5-405. Under this provision, it appears that Mr. Wirsching's refusal would constitute a lack of progress in the view of CDOC officials.

Finally, Mr. Wirsching's Restricted Privileges Status also limited his visitation with family members. When Mr. Wirsching asked that his three-year

---

[2](...continued)
abusive behavior and be willing to discuss it" and "acknowledge that she/he has a current problem in the area of sexual abuse."

-5-

old daughter be allowed to visit him in prison, CDOC officials denied his request.

They invoked the following regulation:

> Visitors will be excluded from the visiting list with authorization from the Administrative Head if they:
>
> > a. Are the victim of the sex offender they are attempting to visit, except under circumstances approved in advance and in writing by the sex offender treatment staff;
> >
> > b. Are under the age of eighteen (18) visiting an offender who has been convicted at any time of sexual assault on a child, incest, or aggravated incest unless approved in advance and in writing by the sex offender treatment staff;
> >
> > c. Are victims of the offender or are children under the age of eighteen (18) years of age, if such visits would be contrary to the rehabilitation of the offender as documented by mental health staff who will evaluate the offender and make recommendations regarding visits which may be detrimental to the offender's rehabilitation.
> >
> > d. Sex offenders who have perpetrated against children shall not loiter near children in the visiting room or participate in any volunteer activity that involves contact with children except under circumstances approved in advance and in writing by the sex offender treatment staff.

Rec. doc. 28, attach. 3 (Admin. Reg. 300-01) ¶ (IV) (A) (8)). According to the

CDOC officials, Mr. Wirsching's refusal to participate in the treatment program

-6-

for sex offenders meant that they could not properly evaluate him to determine if his daughter's visits would be "detrimental to [his] rehabilitation." Id. (Admin. Reg. 300-01(IV)(A)(8)(c)). They denied his continuing requests for visitation privileges with his daughter.

Proceeding pro se, Mr. Wirsching filed this civil rights action alleging that the CDOC's refusal to allow visitation with his children violated his right to familial association under the First Amendment, his Fifth Amendment right against double jeopardy, his Eighth Amendment right to be free from cruel and unusual punishment, his Ninth Amendment rights, and his right to due process and equal protection under the Fourteenth Amendment. He also asserted that the denial of visitation privileges and the denial of the opportunity to earn good time credits at the higher rate available to other prisoners constituted an impermissible punishment for his refusal to incriminate himself. According to Mr. Wirsching, this punishment violated the Fifth Amendment's Self-Incrimination Clause.

In his request for relief, Mr. Wirsching asked the court "to issue an Order granting him and all future prisoners equal rights and privileges as . . . afforded to other inmates." Rec. doc. 3, at 6 (Complaint filed Aug. 26, 1998). He also requested an "Order granting him relief from Sentence and Judgment of Conviction, and such other relief as this Court may deem appropriate." Id. In a subsequent pleading, Mr. Wirsching requested damages. See Rec. doc 40, at 14.

The defendant CDOC officials filed a motion for summary judgment on all of Mr. Wirsching's claims. A magistrate judge issued a recommendation concluding that summary judgment to the defendants was warranted. Mr. Wirsching did not file an objection to the recommendation, and the district court then adopted the recommendation and entered judgment for the defendants.

Proceeding pro se, Mr. Wirsching appealed the grant of summary judgment against him. This Court appointed counsel for Mr. Wirsching and then asked for supplemental briefing regarding the Supreme Court's decision in McKune v. Lile, 536 U.S. 24 (2002). Following the oral argument in this case, Mr. Wirsching's counsel informed the court that, on April 25, 2003, Mr. Wirsching was released from incarceration.

## II. DISCUSSION

On appeal, Mr. Wirsching challenges the district court's grant of summary judgment as to all of his claims. We review the grant of summary judgment de novo, applying the same standard as the district court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. See United States v. AMR Corp., 335 F.3d 1109, 1113 (10th Cir.2003). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." We view the record in the light most favorable to the nonmoving party. See AMR Corp., 335 F.3d at 1113.

However, before we may proceed to the merits, we must address two threshold issues: (1) whether Mr. Wirsching's release from prison renders his claims moot; and (2) whether Mr. Wirsching has waived the right to appeal by failing to object to the magistrate judge's recommendation.

### A. Mootness

Under Article III of the United States Constitution, federal courts may adjudicate only "cases or controversies." As a result, we must "decline to exercise jurisdiction where the award of any requested relief would be moot—i.e. where the controversy is no longer live and ongoing." Cox v. Phelps Dodge Corp., 43 F.3d 1345, 1348 (10th Cir. 1994) (citing Lewis v. Continental Bank Corp., 494 U.S. 472, 477-78 (1990)). "The touchstone of the mootness inquiry is whether the controversy continues to 'touch the legal relations of parties having adverse legal interests' in the outcome of the case," and this legal interest must be "more than simply the satisfaction of a declaration that a person was wronged." Cox, 43 F.3d at 1348 (quoting DeFunis v. Odegarrd, 416 U.S. 312, 317 (1974) (per curiam)). Generally, it is "the settling of some dispute which

-9-

affects the behavior of the defendant toward the plaintiff" that distinguishes a case or controversy from an advisory opinion. Id. at 1348 (quoting Hewitt v. Helms, 482 U.S. 755, 761 (1987)).

Here, following the parties and the district court, we read Mr. Wirsching's complaint as asserting a 42 U.S.C. § 1983 action for (1) declaratory and injunctive relief and (2) damages. As to the former, there is no indication in the record that the remedies that Mr. Wirsching has sought—an order allowing visitation with his children and the opportunity to earn good time credits at a higher rate—would have any effect on the defendant CDOC officials' behavior. Following Mr. Wirsching's release from prison, "the entry of a declaratory judgment [and injunctive relief] in [Mr. Wirsching's] favor would amount to nothing more than a declaration that he was wronged." Green v. Branson, 108 F.3d 1296, 1299 (10th Cir. 1997). Accordingly, we conclude that Mr. Wirsching's claims for declaratory and injunctive relief are now moot. See id. (finding prisoner's claims for declaratory and injunctive relief moot, in light of his release from incarceration, and collecting cases).

In contrast, Mr. Wirsching's damages claims are not moot. Despite Mr. Wirsching's release from prison, those claims "remain viable because a judgment for damages in his favor would alter the defendants' behavior by forcing them to pay an amount of money they otherwise would not have paid." Id. Because we

-10-

read Mr. Wirsching's complaint as seeking damages for all of the constitutional violations he has alleged, there is a case or controversy regarding all of those alleged violations.

### B. Failure to Object to the Magistrate Judge's Recommendation

The magistrate judge's recommendation contained a section stating that the parties had ten days from the date of service to file written objections. The recommendation further stated that "[f]ailure to file written objections to the proposed findings and recommendations . . . may bar the aggrieved party from appealing the factual findings . . . that are accepted or adopted by the District Judge" and that "failure to file written objections concerning legal questions addressed in the recommendation generally operates as a waiver of appellate review of those legal questions." Rec. doc. 61 attach. (Recommendation of United States Magistrate Judge, filed Aug. 16, 2000). The recommendation included a certificate of mailing indicating that it was sent to the prison address provided by Mr. Wirsching—the same address at which he had received prior pleadings and orders.

In Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991), this circuit noted that "we have adopted a firm waiver rule when a party fails to object to the findings and recommendations of the magistrate." That rule "provides that the

failure to make timely objection to the magistrate's findings or recommendations waives appellate review of both factual and legal questions." Id. (internal citations omitted). However, "[t]he waiver rule as a procedural bar need not be applied when the interests of justice so dictate." Id.

Our decisions have not defined the "interests of justice" exception with much specificity. In some instances, we have considered whether the party seeking to invoke the exception himself bore some responsibility for the failure to receive the magistrate's report and recommendation. See Theede v. United States Dep't of Labor, 172 F.3d 1262, 1268 (10th Cir. 1999) (noting, when the appellant asserted that the report and recommendation had been sent to the wrong address, that "[appellant] himself was the source of all the confusion about his proper zip code" and that [the appellant] submitted no less than five different zip codes for the same street address, without every formally advising the court of any change of address or address correction"). We have also considered the appellant's conduct upon learning of the report and recommendation, see id. (refusing to apply the interests of justice exception in part on the grounds that "[appellant] has presented no evidence that he attempted to obtain the magistrate's recommendation upon learning about it by way of the district court's order adopting the recommendation and dismissing [the appellant's ] amended complaint"), as well as the merits of the claims asserted. See id.

Other circuits have adopted a similarly flexible approach.  See United States v. Brown, 79 F.3d 1499, 1504 (7th Cir. 1996) "[F]ailure to challenge before a district judge a magistrate's pretrial rulings . . . waives the right to attack such rulings on appeal[;] [h]owever, . . . this rule is not jurisdictional and thus should not be employed to defeat the ends of justice.") (internal quotation marks and citations omitted); Kent v. Johnson, 821 F.2d 1220, 1223 (6th Cir. 1987) (applying the interests of justice exception).  We note that the Sixth Circuit has considered the importance of the issues raised as one factor in applying the interests of justice exception.  See Kent, 821 F.2d at 1223 (noting that an appeal concerned "questions of considerable import" in proceeding to the merits despite the appellant's failure to object to the magistrate's report).

Here, several factors persuade us that the interests of justice warrant consideration of Mr. Wirsching's appeal.  First, there is no indication of delay on Mr. Wirsching's part in seeking to obtain the report and recommendation.  The record indicates that after filing a timely notice of appeal referring to the district court's two-page order adopting the magistrate's report and recommendation, the court informed Mr. Wirsching that it was considering summary dismissal of the appeal.  Mr Wirsching responded to the court that he "would love to file a brief on the recommendations [;] the only problem is that I don't know what those recommendations were."  Letter, dated Nov. 15, 2000.  Mr. Wirsching then

requested a copy of the report and recommendations.  In his opening brief, Mr. Wirsching stated "I received only a two (2) page Order from the Court stating that I was denied.  There was no paperwork showing any finding of fact of conclusion of law attached."  Aplt's Pro se Opening Br. at 3, filed Jan. 31, 2001.

Moreover, in light of all the circumstances of this case, we find Mr. Wirsching's allegation that he did not receive the magistrate's report and recommendation to be facially plausible.  Throughout the proceedings, Mr. Wirsching has been a fairly tenacious litigant, filing a pro se complaint, requesting on several occasions that the district court appoint counsel for him, responding to the defendants' motions to dismiss and for summary judgment, and filing a supplemental brief.  Failing to object to a report and recommendation that warned him that he could lose his right to appeal is inconsistent with that conduct.  Accordingly, in light of Mr. Wirsching's plausible contention, and the "issues of considerable import" involved here, see  Kent, 821 F.2d at 1223, we conclude that the interests of justice support an exception to our firm waiver rule.  We therefore proceed to the merits of this appeal.

C.  First Amendment and Due Process Claims Involving Denial of Visitation

Mr. Wirsching argues that the district court erred in granting summary

judgment against him on his claims challenging the denial of visitation with his child. He maintains that the CDOC's no-visitation policy violated his First Amendment rights of familial association as well as his due process rights under the Fourteenth Amendment.

We acknowledge at the outset that the interests Mr. Wirsching asserts are important ones. The Supreme Court has held that "parents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children." Hodgson v. Minnesota, 497 U.S. 417, 483 (1990) (Scalia, J., concurring in part and dissenting in part, and citing Santosky v. Kramer, 455 U.S. 745, 753-754 (1982); Caban v. Mohammed, 441 U.S. 380 (1979); and Stanley v. Illinois, 405 U.S. 645, 651-652 (1972)). In the prison context, courts and commentators have observed that visitation may significantly benefit both the prisoner and his family. See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 465-70 (1989) (Marshall, J., dissenting); see also Thornburgh v. Abbott, 490 U.S. 401, 407 (1989) (stating that "[a]ccess [to prisons] is essential . . . to families and friends of prisoners who seek to sustain relationships with them").

Nevertheless, "[t]he very object of imprisonment is confinement," and "[m]any of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner." Overton v. Bazzetta, 123 S. Ct. 2162, 2167 (2003).

Prisoners do not retain rights inconsistent with proper incarceration, and "freedom of association is among the rights least compatible with incarceration." Id. Accordingly, the Constitution allows prison officials to impose reasonable restrictions upon visitation. See id.

In assessing the CDOC visitation restriction, we apply the standard set forth in Turner v. Safley, 482 U.S. 78, 89 (1987): "a prison regulation imping[ing] on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." That deferential review follows from the principle that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." Id.

Accordingly, we must "balance the guarantees of the Constitution with the legitimate concerns of prison administrators," Beerheide v. Suthers, 286 F.3d 1179, 1185 (10th Cir. 2002), asking (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement

alternatives exist that would accommodate the prisoner's rights. See Turner, 482 U.S. at 89-91. "Turner thus requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoners' constitutional rights may be curtailed." Beerhide, 286 F.3d at 1186.

We begin our analysis with the Supreme Court's recent decision in Overton. There, the Supreme Court applied the four-part Turner inquiry to Michigan's policy banning visits between prisoners and (a) children as to whom the prisoner's parental rights had been terminated and (b) minors who were not the prisoner's children, stepchildren, grandchildren, or siblings.[3] The Court overturned the Sixth Circuit's decision—which had held that the policy violated the prisoners' First Amendment rights.

We emphasize that the policy at issue in Overton did not bar visits with the prisoner's own children, as does the CDOC policy challenged here by Mr. Wirsching. Moreover, some of the institutional concerns noted by the Overton Court are not as apparent here. Nevertheless, the Court's application of the Turner inquiry offers useful guidance.

The Court concluded that "the [Michigan] regulations bear a rational

---

[3] Other Michigan visitation policies were also at issue in Overton, but, as those other policies did not address limitations on visits with children, we do not discuss them here.

relation to [the Department of Corrections] valid interests in maintaining internal security and protecting child visitors from exposure to sexual or other misconduct or from accidental injury." Overton, 123 S. Ct. 2167. The Court added that "[t]he regulations promote internal security, perhaps the most legitimate of penological goals . . . by reducing the total number of visitors and by limiting the disruption caused by children in particular. Protecting children from harm is also a legitimate goal." Id.

The Court then noted that prisoners had alternative means of remaining in contact with family members: they could communicate by letter and telephone with those with whom they could not visit. Finally, the Court observed that accommodating the Michigan prisoners' demands for visitation would cause a significant reallocation of the prison system's resources. Moreover, the plaintiff prisoners were unable to "point[] to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." Id. at 2169.

As to the CDOC regulation at issue here, we begin with the first Turner inquiry— whether a rational connection exists between the prison regulation and a legitimate governmental interest advanced as its justification. See Turner, 482 U.S. at 89-90. The district court concluded that CDOC officials had identified two legitimate penological interests to support the ban on Mr. Wirsching's visits

-18-

with his children: the protection of the children themselves and the furthering of rehabilitation of convicted sex offenders like Mr. Wirsching. See Rec. doc. 61, at 5-6 (citing Werner v. McCotter, 49 F.3d 1476, 1479 (10th Cir. 1995); Mosier v. Maynard, 937 F.2d 1521, 1525 (10th Cir. 1991)); see also Overton, 123 S. Ct. at 2167 (stating that "[p]rotecting children from harm is also a legitimate goal").

That conclusion is supported by an affidavit from a CDOC social worker (who is also a licensed professional counselor) offered by the defendants in support of their motion for summary judgment. The social worker stated that "[t]he rationale for disallowing visits with children is the potential risk for harm to the child. Risk factors for sex offending behavior should be considered higher if these individuals are allowed visits with children." Rec. doc. 28, at 2 (Aff. of Glynette Smith, filed Jan. 15, 1999). She added that the Colorado Sex Offender Management Board Standards and Guidelines recommended that "[s]ex offenders should have no contact with children, including their own children, unless approved in advance and in writing by the prison treatment provider." Id. at 3 (quoting Colorado Sex Offender Treatment Board Standards § 3.511(B)).

In response, Mr. Wirsching contends that the ban on visitation is rationally related to neither the protection of children nor his own rehabilitation. He notes that the record contains no evidence that he has ever harmed or attempted to harm his young daughter and that his alleged victims "were not of a similar age or

-19-

situation as his daughter." Aplt's Opening Br. at 17. As to rehabilitation, Mr. Wirsching cites decisions acknowledging the rehabilitative effect of prisoners' visits with family members. See id. at 18-19 (citing, inter alia, Ramos v. Lamm, 639 F.2d 559, 581 (10th Cir. 1980)).

Mr. Wirsching's arguments ignore the substantial deference we must accord "to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 123 S. Ct. at 2167. Here, the CDOC has offered some evidence indicating that contact between sex offenders and children, even their own children, may adversely affect both the child and the offender. See Rec. doc. 28, at 2-3 (Aff. of Glynette Smith, filed Jan. 15, 1999). Although that evidence may be debatable, and a particular sex offender may constitute no threat whatsoever to his own children, it is noteworthy that Mr. Wirsching himself offered no evidence to support his challenges to the CDOC's objectives. Moreover, as the Court noted in Overton, "the burden . . . is not on the State to prove the validity of the prison regulations but on the prisoner to disprove it." Overton, 123 S. Ct. at 2168. We therefore conclude that there is a rational connection between the CDOC policy and legitimate governmental interests. See Turner, 482 U.S. at 89-91.

As to the second Turner inquiry— whether alternative means of exercising

-20-

the right are available notwithstanding the policy—Mr. Wirsching acknowledges that prison officials have allowed him to contact his children by letter and telephone. See Aplt's Opening Br. at 19-20. However, he contends that "visitation offers the best method for exercising even a limited right to raising his child while in prison." Id. at 20. Even so, we note, alternatives "need not be ideal . . . they need only be available." Overton, 123 S. Ct. at 2169. Prison officials are simply not required, as a matter of constitutional law, to provide Mr. Wirsching with the "best method" of raising his child. Accordingly, we agree with the district court that the fact that Mr. Wirsching may maintain contact with his children through means other than visitation supports the reasonableness of the CDOC policy.

As to the third and fourth Turner inquiries—the effect within the prison of accommodating the asserted right and the availability of alternatives that would accommodate the prisoner, see Turner, 482 U.S. at 90-91, Mr. Wirsching argues that because the general prison population is allowed visitation with children, his request would impose no significant additional burden on the CDOC officials. He then proposes an alternative to the complete ban on visitation: monitored visits with a prohibition on physical contact. He suggests that monitored visits would not impose "more than a de miminis cost to the valid penological goal." Overton, 123 S. Ct. at 2169; Aplt's Br. at 22.

Again Mr. Wirsching's arguments are insufficient to overcome the deference we afford prison officials in these matters. In support of their motion for summary judgment, the defendants offered the prison social worker's affidavit, which stated that visitation may be harmful to the child and may undermine the rehabilitation of the offender and that any such visitation should be assessed by the treatment staff before it is authorized. See Rec. doc. 28, at 2-3 (Aff. of Glynette Smith, filed Jan. 15, 1999). Mr. Wirsching offered neither any evidence to rebut that statement nor any evidence suggesting biased or unprofessional conduct by the treatment staff. As a result, his assertions as to the minimal effect of allowing visitation and the de minimis cost of monitored, non-contact visits are of little weight.

In assessing Mr. Wirsching's arguments, we do not discount the importance of his relationship with his children. Even inside the prison walls, that relationship is generally deserving of some form of protection. The complete ban upon Mr. Wirsching's visits with his children is indeed a harsh restriction, significantly more severe than the ban on family visits upheld in Overton.[4] Prison officials should be careful to ensure that restrictions upon visitation with a prisoner's children are justified by the circumstances, and they should seriously consider less draconian restrictions—such as closely monitored, noncontact

---

[4] As noted above, the restriction upon family visits upheld in Overton concerned (a) children as to whom the prisoner's parental rights had been terminated and (b) minors who were not the prisoner's children, stepchildren, grandchildren, or siblings.

visitation. Had Mr. Wirsching offered evidence as to the feasibility and minimum institutional effect of a less restrictive visitation policy, this would be a closer case.

Nevertheless, we are aware that the treatment of sex offenders, like many other aspects of prison administration, presents substantial difficulties. See McKune v. Lile, 536 U.S. 24, 33-34 (2002) (discussing the high rates of recidivism among sex offenders and characteristics of effective treatment programs). On this record we conclude that, in refusing to allow visits between a convicted sex offender who refused to comply with the requirements of the treatment program and his child, the defendants did not violate Mr. Wirsching's First and Fourteenth Amendment rights. Accordingly, the district court properly granted summary judgment in favor of those officials and against Mr. Wirsching on his damages claims.

D. Fifth Amendment Compulsion Claim

Mr. Wirsching also contends that CDOC officials violated his Fifth Amendment rights by punishing him for refusing to comply with one of the requirements of the treatment program—that he admit that he committed a sex offense. He points to the denial of visitation privileges and the denial of the opportunity to earn good time credits at the higher rate available to other

prisoners. He maintains that these actions constituted coercion in response to his refusal to incriminate himself.

In McKune, 536 U.S. 24, a divided Supreme Court reversed a decision of this court applying the Fifth Amendment's bar on compelling incriminating testimony. This court had concluded that a Kansas policy restricting an inmate's privileges and transferring him to a maximum security prison after he refused to disclose his sexual history (as required by a sex offender treatment program) constituted impermissible compulsion. See McKune v. Lile, 224 F.3d 1175 (10th Cir. 2000). Four justices concluded that the standard set forth in Sandin v. Conner, 515 U.S. 472, 484 (1995), should control in determining whether the imposition of these consequences constituted impermissible compulsion: if the consequences constituted "atypical and significant hardship[s] on [inmates] in relation to the ordinary incidents of prison life" then the program would violate the Fifth Amendment. See McKune, 536 U.S. at 29-48.

Applying the Sandin standard to the facts before it, the plurality concluded that the penalties imposed against the prisoner were significantly less than potential penalties other inmates faced in cases where the Supreme Court ruled that there was no Fifth Amendment violation. See McKune, 536 U.S. at 42-45. Accordingly, the plurality concluded that the Kansas program did not violate the plaintiff prisoner's Fifth Amendment right against self-incrimination. Id. at 48.

Because she disagreed with the plurality's application of Sandin's "atypical and significant hardship" standard, Justice O'Connor did not join in the plurality opinion in McKune. However, she did agree that the consequences of the plaintiff prisoner's refusal to incriminate himself were not "so great as to constitute compulsion for the purposes of the Fifth Amendment privilege against self-incrimination." Id. at 49-50 (O'Connor, J., concurring). Thus, she concurred in the judgment.

As we noted in Searcy v. Simmons, 299 F.3d 1220, 1225 (10th Cir. 2002), "[b]ecause Justice O'Connor based her conclusion on the narrower ground that the KDOC's policy was not compulsion under the Fifth Amendment, we view her concurrence as the holding of the Court in McKune." See Marks v. United States, 430 U.S. 188, 193 (1977) (stating that the holding of a fragmented Court "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"). Accordingly, the question we must resolve is whether, under the standard applied by Justice O'Connor in her concurring opinion, the consequences of Mr. Wirsching's refusal to participate in the treatment program for sexual offenders were "so great as to constitute compulsion" for purposes of the Fifth Amendment privilege against self-incrimination. McKune, 530 U.S. at 49-50 (O'Connor, J., concurring).

In this regard, we note that the consequences suffered by the plaintiff

-25-

prisoner in McKune—reduction in privileges and a transfer to a maximum security prison—resemble most of the consequences faced by Mr. Wirsching here. Compare McKune, 536 U.S. at 24 (describing the plaintiff prisoner's reduction in privileges for refusing to participate in a treatment program as involving the curtailment of "visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to a personal television, and other privileges" and adding that "[the prisoner] would be transferred to a maximum-security unit, where his movement would be more limited, he would be moved from a two-person to a four-person cell, and he would be in a potentially more dangerous environment") with Rec. doc. 29 at 3 (describing Mr. Wirsching's reduction in privileges for failure to participate in the treatment program as including "no television or radio in the cell, no tobacco items, no canteen [except on medical or religious grounds]," removal of property items, denial of recreation with the general prison population, and the wearing of orange-colored, prison-issue pants). In her concurring opinion in McKune, Justice O'Connor characterized changes in the prisoner's living conditions as "minor," McKune, 536 U.S. at 51 (O'Connor, J., concurring). Following that opinion, we conclude that the similar changes in Mr. Wirsching's living conditions do not constitute "compulsion" under the Fifth Amendment.

Nevertheless, Mr. Wirsching's refusal to participate in the treatment

program did result in two additional consequences not suffered by the plaintiff prisoner in McKune: (1) the loss of opportunity to accrue good time credits at an increased rate, and (2) the prohibition of visitation with his own children. See id. at 51-52 (O'Connor, J., concurring) (distinguishing the consequences faced by the plaintiff from those in which the prisoner faced "longer incarceration" and also noting that, while the plaintiff's visitation was reduced, "he still retains the ability to see his attorney, his family, and members of the clergy"). Thus, we must determine whether these additional adverse consequences are "serious enough to compel [Mr. Wirsching] to be a witness against himself." Id. at 2033-34.

This circuit's opinion in Searcy resolves the question as to good time credits. There, we held that the withholding of those credits to a Kansas prisoner who refused to participate in a treatment program did not constitute compulsion. See Searcy, 299 F.3d at 1226 ("[A]t most, foreclosing Mr. Searcy from the mere opportunity to earn good time credits is not a new penalty, but only the withholding of a benefit that the [Kansas Department of Corrections] is under no obligation to give"). Thus, the plaintiff prisoner "was left with a choice: take advantage of a benefit that the [Department of Corrections] provided or turn down that benefit in order to avoid what he feared, perhaps legitimately, would be self-incriminating statements." Id. Such a choice did not constitute compulsion.

Searcy is controlling here. As in Kansas, the Department of Corrections in

Colorado retains discretion in awarding good time credits. See Col. Rev. Stat. § 17-22.5-405 (stating that "[e]arned time, not to exceed ten days for each month of incarceration or parole, may be deducted from the inmate's sentence") (emphasis added); Duncan v. Gunter, 15 F.3d 989, 992 (10th Cir. 1994) (noting the discretionary language in the Colorado good time credit statute). Mr. Wirsching, like Mr. Searcy, was faced with a choice between the opportunity to earn credits at the higher rate or declining that opportunity by refusing to participate in the treatment program and thereby avoiding the requirement that he admit to commiting a sex offense. "The pressure imposed upon [Mr. Wirsching] . . . d[id] not 'rise[] to a level where it is likely to compel a person to be a witness against himself.'" Searcy, 299 F.3d 1227 (quoting McKune, 536 U.S. at 49 (O'Connor, J., concurring) (other quotation marks and citations omitted)).

As to denial of visitation privileges with his children, we note that we have already concluded that the CDOC's policy did not violate Mr. Wirsching's rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment. For similar reasons, we conclude that the CDOC's ban on visits between Mr. Wirsching and his children did not constitute compulsion in violation of the Fifth Amendment.

We are not persuaded by Mr. Wirsching's contention that the fact that he

entered an Alford plea to sex offense for which he was incarcerated indicates that the CDOC has compelled self-incriminating testimony. In our view, the Alford plea does not affect the Fifth Amendment compulsion analysis.

An Alford plea is one in which a defendant may maintain his innocence while agreeing to forego his right to a trial. See North Carolina v. Alford, 400 U.S. 25, 37 (1970) ("An individual accused of [a] crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."); see also United States v. Tunning, 69 F.3d 107, 110 (6th Cir. 1995) ("In its strictest sense, then, an 'Alford plea' refers to a defendant who pleaded guilty but maintained that he is innocent.") (internal quotation marks omitted). "However, for such a plea to be valid, it must be based on the defendant's intelligent conclusion that 'the record before the judge contains strong evidence of actual guilt.'" United States v. Maez, 915 F.2d 1466, 1467 (10th Cir. 1990) (quoting Alford, 400 U.S. at 37); see also United States. v. Mackins, 218 F.3d 263, 268 (3rd Cir. 2000) ("As Alford and the cases which followed in its wake made clear, however, there must always exist some factual basis for a conclusion of guilt before a court can accept an Alford plea; indeed, a factual basis for such a conclusion is 'an essential part' of an Alford plea.").

From our reading of Justice O'Connor's concurring opinion in McKune, we

-29-

see no indication that whether the defendant has previously admitted or failed to admit the sexual misconduct at issue is a factor in the compulsion analysis. Instead, what matters are the consequences of the prisoner's failure to admit to the offense while he is incarcerated, and the analysis turns on the severity of those consequences.

That reading of <u>McKune</u> is borne out by our approach in <u>Searcy</u>. There, the defendant had pleaded nolo contendere to a charge of sexual exploitation of a child. <u>See</u> <u>Searcy</u>, 299 F.3d at 1222. We did not discuss the fact that the defendant had not yet admitted to sexual misconduct.[5]

That Mr. Wirsching's <u>Alford</u> plea is not relevant to the Fifth Amendment analysis here is also supported by the way in which those pleas are treated in other contexts. For example, in <u>Blohm v. C.I.R.</u>, 994 F.2d 1542, 1554-55 (11th Cir. 1993), the Eleventh Circuit held a taxpayer who had entered into an <u>Alford</u> plea to a tax evasion charge was collaterally estopped from denying fraud in a subsequent

---

[5] "[I]n most jurisdictions . . . a nolo plea is not a factual admission that the pleader committed a crime. Rather, it is a statement of unwillingness to contest the government's charges and an acceptance of the punishment that would be meted out to a guilty person." <u>Olsen v. Correiro</u>, 189 F.3d 52, 59 (1st Cir. 1999). As the Supreme Court noted in <u>Alford</u>, "Throughout its history . . . the plea of nolo contendere has been viewed not as an express admission of guilt but as a consent by the defendant that he may be punished as if he were guilty and a prayer for leniency." 400 U.S. at 36 n.8.

-30-

civil proceeding.  See id. at 1554 ("[T]he collateral consequences flowing from an Alford plea are the same as those flowing from an ordinary plea of guilt."); Cortese v. Black, 838 F. Supp. 485, 491 (D. Colo. 1993) ("[C]ourts treat Alford pleas as having the same preclusive effect as a guilty plea."), aff'd, No. 95-1429, 1996 WL 346618 (10th Cir. June 2, 1996)).  Here, by requiring Mr. Wirsching to participate in the treatment program or forego certain privileges, the CDOC treated Mr. Wirsching's Alford plea as it would a conviction obtained by other means—such as a guilty plea or a jury trial.  This was permissible under the Fifth Amendment.

### F. Mr. Wirsching's Other Claims

Mr. Wirsching raises several other claims that do not require extensive discussion.  In particular, he maintains that: the CDOC's visitation policy (1) imposes an additional punishment for his 1982 sexual assault conviction, thereby violating the Fifth Amendment's Double Jeopardy Clause; (2) constitutes cruel and unusual punishment under the Eighth Amendment; and (3) the policy violates his equal protection rights under the Fourteenth Amendment.

For substantially the same reasons set forth by the magistrate judge, we conclude that these arguments lack merit:   As to double jeopardy, it is well established that prison disciplinary sanctions do not implicate that Fifth Amendment right.  See Lucero v. Gunter, 17 F.3d 1347, 1351 (10th Cir. 1994).  As

-31-

to the Eighth Amendment, the Court has held that visitation with a particular person does not constitute basic necessity, the denial of which would violate the Eighth Amendment. See Thompson, 461 U.S. at 461; see also Overton, 123 S Ct. at 2169 (distinguishing restrictions on visitation from the permanent withdrawal of all visitation privileges or the arbitrary application of a ban on visitation to a particular inmate). Finally, there is no Fourteenth Amendment violation here either. Treating sex offenders differently than others not convicted of these crimes is rationally related to a legitimate state objective. See Martinez v. Flowers, 164 F.3d 1257, 1261 (10th Cir. 1998) (upholding classification of violent offenders); Lustgarden v. Gunter, 966 F.2d 552, 555 (10th Cir. 1992) (holding that sex offenders are not members of a suspect classification and that the decision to deny them mandatory parole did not violate the Equal Protection Clause); see generally Brown v. Zavaras, 63 F.3d 967, 970 (10th Cir. 1995) (applying the rational basis standard to the treatment of a prisoner and stating that "[w]hen the plaintiff is not a member of a protected class and does not assert a fundamental right, we determine only whether government classifications have a rational basis").

## III.  CONCLUSION.

Accordingly, for the reasons set forth above, we DISMISS Mr. Wirsching's claims for declaratory and injunctive relief as moot.  As to Mr. Wirsching's claims for damages, we AFFIRM the district court's grant of summary judgment against Mr. Wirsching and in favor of the CDOC.