HENRY, Circuit Judge,
concurring.
I concur, based upon our standard of review, but write separately to note that *1276 this is a close and difficult case. The expert evidence in this case is one-sided, strongly suggesting that Mr. Diestel “was being directed by hallucinations,” Rec. vol. VI, at 30, and thus was “incapable of knowing [the] wrongfulness” of his actions at the time of this tragic murder. Okla. Stat. Ann. tit. 21, § 152(4). Dr. John Call, the State’s expert witness, chose not to testify as to the ultimate issue of fact, although Oklahoma law allows it. Further troubling is the Oklahoma Court of Criminal Appeals’ (OCCA) heavy reliance upon lay testimony of strangers — people who did not know or had merely had a casual brush with' Mr. Diestel. See Kiser v. Boone, 4 Fed.Appx. 736, 742 (10th Cir.2001) (granting habeas relief for insufficiency of evidence that defendant was sane at the time of the homicide and noting that “ ‘[bjefore a non-expert witness is competent to testify to the sanity or insanity of another person, he must show an acquaintance of such intimacy and duration as to clearly indicate that his testimony will be of value in determining the issue’ ”) (quoting McKenzie v. United States, 266 F.2d 524, 526-27 (10th Cir.1959)). Finally, I also take this opportunity to comment on a new and salutary development in Oklahoma law, which adopts the instruction Mr. Diestel unsuccessfully requested at trial, and would have helped in this case.
1. Oklahoma’s Evidentiary Rules
Unlike the Federal Rules of Evidence, Oklahoma law permits experts to testify as to whether a criminal defendant did or did not have the requisite mental state to commit the crime with which he has been charged. Compare 12 Okla. Stat. § 2704 (“Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.”) with Fed.R.Evid. 704(b) (prohibiting experts from testifying as to whether a criminal had “the mental state or condition constituting the mental state element of the crime charged”). Thus, under Oklahoma law, “[a]ny properly qualified expert testifying in accordance with the standards governing admissibility of expert testimony may offer an opinion on the ultimate issue if it would assist the trier of fact.” Johnson v. State, 95 P.3d 1099, 1104 (Okla.Crim.App.2004). Further, under Oklahoma law, “expert witnesses can suggest the inference which jurors should draw from the application of specialized knowledge to the facts.” Romano v. State, 909 P.2d 92, 109 (Okla.Crim.App.1995). However, Oklahoma law does not permit “opinion testimony which merely tells a jury what result to reach....” Id.
Like Mr. Diestel’s expert witnesses, Dr. Therese Hall and Dr. John Smith, Dr. Call, the State’s expert, could properly have testified as to whether Mr. Diestel had the mental capacity to have been criminally responsible. See Coddington v. State, 142 P.3d 437, 449 (Okla.Crim.App.2006) (“Experts for the State routinely testify to conclusions drawn from their specialized knowledge even on ultimate issues.”); see also Lott v. State, 98 P.3d 318, 342-343 (Okla.Crim.App.2004) (holding that the State’s expert on sexual assault could properly testify rape was result of non-consensual sex and conclude that oral sodomy had occurred based upon her examination of physical evidence); Abshier v. State, 28 P.3d 579, 604 (Okla.Crim.App.2001) (concluding that the State’s expert witness could testify that a child was conscious and crying during beating from defendant based upon his experience and studies), rev’d on other grounds by Jones v. State, 134 P.3d 150 (Okla.Crim.App.2006); Welch v. State, 2 P.3d 356, 368-369 (Okla.Crim.App.2000) (holding that the trial court did not err in allowing detective’s *1277 testimony that victim’s death was not accidental but intentionally inflicted).
Oklahoma law is perhaps superior to the Federal Rules: it seems to me if a qualified psychologist, or, better yet, the “only board-certified forensic psychologist” in the state, Maj. Op. at 1268, has a clear opinion about whether a person knows the difference between right or wrong, it may well be helpful to a fair resolution of the case that he or she express it.[1]
2. Use of lay testimony
I am also troubled by the fact that the OCCA justified its decision in part by relying on the lay testimony of people that had no connection with the defendant at all. We condemned similar evidence in Kiser v. Boone, 4 Fed.Appx. 736, 742 (10th Cir.2001). Although Kiser is unpublished, its reasoning is the most analogous in our circuit.
In that case, the State’s expert examined Mr. Kiser, the defendant, who had shot his wife’s romantic partner one day after his wife filed for divorce, to determine whether or not Mr. Kiser was competent to stand trial. The expert did not examine Mr. Kiser to determine whether Mr. Kiser was sane at the time of the murder. Id. at 740. Mr. Kiser presented two experts, each of whom testified that he did not appreciate the wrongfulness of his actions at the time he shot the victim. Id. at 739. The State relied on lay witnesses to establish Mr. Kiser’s sanity. A neighbor of the victim testified that the defendant, whom he had not previously met, appeared “nice” and “polite” on the day of the shooting. Id. at 741. A friend of the victim, who did not know Mr. Kiser before, testified to a conversation he had with the victim during which the victim confided his concern about a telephone call from Mr. Kiser threatening to kill him. Id.
The jury convicted Mr. Kiser of first degree murder, and the OCCA denied relief, finding Mr. Kiser’s evidentiary sufficiency challenge to be meritless. 4 Fed.Appx. at 741 (quoting Kiser v. State, 782 P.2d 405, 407 (Okla.Cr.App.1989)). The federal magistrate judge reviewing Mr. Kiser’s habeas petition recommended that relief be granted and the district court agreed. Id. Reviewing with AEDPA deference, we discounted the lay testimony provided by the two witnesses who had “no previous association” with Mr. Kiser. Id. at 742 (citing McKenzie, 266 F.2d at 526-27); see also United States v. Madrid, 673 F.2d 1114, 1123 (10th Cir.1982) (applying McKenzie); United States v. Coleman, 501 F.2d 342, 345 (10th Cir.1974) (same).
The Kiser court also rejected the OCCA’s conclusion that the State expert had refuted the defense experts’ testimony because the State’s expert had acknowledged that he did not examine the defendant to ascertain the defendant’s mental state at the time of the killing. Thus, the panel held that the defense experts’ testimony “was overwhelming in light of the state’s insufficient and indefinite evidence of his sanity.” 4 Fed.Appx. at 741.
In this case, the jury was presented with only mildly conflicting medical testimony regarding Mr. Diestel’s condition. Unlike in Kiser, all experts agreed as to the severity of and the existence of Mr. Diestel’s paranoid schizophrenia. Admittedly, the *1278 State’s expert in Kiser only evaluated Mr. Kiser for competency, and here, “Dr. Call focused on Mr. Diestel’s state of mind at the time of the offense.” Maj. Op. at 1272. However, Mr. Diestel’s defense seems significantly stronger — unlike in Kiser, the State’s expert here did not suggest the defense was a “cop out” or “nonsense.” 4 Fed.Appx. at 740.
Additionally, the State presented no lay testimony from any witness who had any previous association with Mr. Diestel before briefly encountering him on the day of the shooting. We acknowledge, as the State points out, “[l]ay witnesses can testify about their observations of defendants if those observations are reasonably proximate in time to the proceedings.” McGregor v. State, 885 P.2d 1366, 1374 (Okla.Crim.App.1994). Oklahoma law also allows “[l]ay witnesses [to] give an opinion as to whether a defendant knew right from wrong at the time of crime if the opinion is rationally based on witness perception and helpful to a clear understanding of the testimony or determination of the fact in issue.” Id. (emphasis added). “A jury can disregard entirely the testimony of psychiatric or medical experts and find sanity from the testimony of lay witnesses alone.” Id. at 1376.
It is worth noting, however, that in McGregor, a fellow inmate who had observed the defendant over a period of time provided testimony regarding the defendant’s competency. Here, none of the State’s lay witnesses had “an acquaintance” with Mr. Diestel of any “intimacy” over a period of time of any significance. McKenzie, 266 F.2d at 526.
Given the above and given what Dr. Call said regarding Mr. Diestel’s mental state,[2] I cannot say that, absent AEDPA’s strictures, I could affirm the OCCA’s legal conclusion that Mr. Diestel was sane at the time of the crime.
3. Not Guilty by Reason of Insanity Jury Instruction
Finally, as to the requested jury instruction, the consequences of a verdict of not guilty by reason of insanity in Oklahoma is clear: the court
shall thereupon order the defendant committed to the state hospital for the mentally ill, or other state institution provided for the care and treatment of cases such as the one before the court, until the sanity and soundness of mind of the defendant be judicially determined, and such person be discharged from the institution according to law.
Okla. Stat. Ann., tit. 22, § 925.
Mr. Diestel proposed the following instruction, which the trial court refused to give:
Under the law of the State of Oklahoma and the facts of this case, if you find the Defendant, William James Diestel, guilty of Murder in the First Degree, *1279 you shall fix his punishment as either, imprisonment for life without parole or imprisonment for life. If you find the Defendant, William James Diestel, not guilty by reason of insanity, the Defendant shall be committed to a State Hospital for the Mentally Ill where he shall remain until released pursuant to the laws of the State of Oklahoma.
Aple’s App. at 32.
In denying relief on this claim, the Court of Criminal Appeals quoted from its decision in Ullery v. State, 988 P.2d 332, 346 (Okla.Crim.App.1999):
Ullery claims he was denied due process and a fair trial by the trial court’s refusal to instruct the jury on the dispositional consequences of a not guilty by reason of insanity verdict. Ullery never contested the State’s allegation that he killed Neal. During individual voir dire counsel told prospective jurors that Ullery admitted the killing and relied solely on his insanity defense. The trial court denied Ullery’s repeated requests to instruct the jury on the consequences of a verdict of not guilty by reason of insanity, as well as his offer of testimony on this issue....
The[ ] trial court based its rulings in a belief that an instruction on the consequences of a not guilty by reason of insanity verdict is not permitted. This Court has held failure to give such an instruction was not error because the statutory mandatory commitment procedures are “merely a procedural statement of disposition subsequent to the verdict and [are] immaterial to the process of rendering a verdict concerning the sanity of the accused.” The United States Supreme Court held in Shannon v. United States, [512 U.S. 573, 575 (1994)], that federal law does not require this instruction. The Supreme Court analogized to the situation where the State fails to meet its burden of proof regarding guilt, noting there the system assumes a juror will vote to acquit even if the juror is convinced the defendant is dangerous and should be imprisoned. We decline to revisit these decisions in this case. This proposition is denied.
Diestel v. State, No. F-2001-1501 slip op. at 12-13 (filed Nov. 13, 2002) (quoting Ullery, 988 P.2d at 346) (emphasis added) (footnotes and some internal citations omitted).
But the distinction between Shannon, which applied federal law, and Oklahoma law, is noteworthy: “In reaching its conclusion, the Court noted the well-established principle that, ‘when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed.’ ” Neely v. Newton, 149 F.3d 1074, 1085 (10th Cir.1998) (quoting Shannon, 512 U.S. at 579, 114’ S.Ct. 2419) (internal quotation marks omitted,). Under Oklahoma law, there is no question that the jury serves the absolute sentencing function. Moreover, the jurors in Shannon, unlike the jurors here, were instructed to disregard the consequences of their verdict.
■ In Fears v. State, No. F-2004-1279 (Okla.Crim.App. filed July 7, 2006),[3] the *1280 OCCA held that “[l]aw, logic, fundamental fairness and common sense require that juries be told [of] the consequences of their verdict, not guilty by reason of insanity.” Id. slip. op. at 19. As the OCCA points outs, at least twenty-five states require a jury instruction on the consequences of a verdict of not guilty by reason of insanity, and eleven require the instruction by statute. Id. at 11-13 & nn. 26-27. “In most of these jurisdictions, juries do not impose sentence.” Id. at 12-13. The Fears decision, which I recognize is unpublished and which is not retroactive to cases on habeas review, laudably recognizes that Oklahoma jurors imposing sentences must be informed of accurate information about sentencing consequences. Id. at 14.
Fears brings Oklahoma law in line with the recommendations of both the National Alliance of Mental Illness (NAMI) and the American Bar Association (ABA). NAMI has long urged the following:
At the very least, judges should be required to instruct juries ... as to what will happen to a defendant found not guilty by reason of insanity: that they will be hospitalized in secure facilities for treatment, and if they ever recover sufficiently to return to the community, they will be subject to continued monitoring.[4]
Similarly, the ABA has concluded that a “court should instruct the jury as to the dispositional consequences of a verdict of not guilty by reason of [insanity].” ABA, Criminal Justice Mental Health Standards § 7-6.8 cmt. at 342 (1986) (brackets in original). “[J]urors who are not informed about dispositional consequences will speculate about the practical results of a non-responsibility verdict and, in ignorance of reality, will convict persons who are not criminally responsible in order to protect society.” Id. at 345. The ABA concluded that an instruction was “the most sensible approach given the potential for prejudice,” id., when no instruction is provided, and observed the following:
Particularly in cases in which defendants are charged with violent crimes (which is usually the case if the nonresponsibility issue is tried to a jury, as opposed to a judge), juries need to be told about the effect of a finding of mental nonrespon-sibility [insanity] if the possibility of a serious injustice is to be avoided.
Id. (brackets in original).
In the end, I would prefer that the proposed instruction had been given, as it seems the “most sensible approach” as held in Fears. See slip op. at 19. I thus agree that, given AEDPA deference, the OCCA did not unreasonably apply federal *1281 law as to the sufficiency of the evidence regarding Mr. Diestel’s mental state. I also agree that the OCCA did not misapply clearly established federal law when it refused to give the now-approved Fears instruction. If Mr. Diestel did know the difference between right and wrong at the time of the horrible murder of Mr. Casey, Mr. Diestel deserves the sentence he received. If, as considerable evidence indicates, Mr. Diestel is seriously mentally deranged, life imprisonment in a maximum security prison seems unlikely to be an intelligent choice. Had Fears been the law, we would have a better idea of what the jury believed to be the truth.

. Indeed, it appears that the OCCA believes that Dr. Call has expressed such an opinion before. See Reid v. Boone, 27 Fed.Appx. 959, 962 (10th Cir.2001) ("Dr. Call testified that, at the time of the killing, [the defendant] was suffering from a substance induce[d] psychotic disorder that included hallucinations. However, Dr. Call further testified that [the defendant] knew that he was committing a murder and knew that it was wrong.”) (internal quotation marks and citations omitted).

. Dr. Call’s testimony noted that Mr. Diestel: • had "command delusions,” Supp. Rec. vol. VI, at 21;
suffered from paranoid schizophrenia prior to and on the date of the homicide, id. at 24, 26, 31, 32;
thought his victim was "Nero reincarnated,” id. at 31;
was "mentally disturbed,” id. at 24;
had a lengthy obsession with the victim, that "even to a psychologist” would be a "red flag,” id. at 25; was found not competent to stand trial on Nov. 9, id. at 27;
believed he was being directed by hallucinations, and that "he believed that he had this delusion that the individual and the victim was [sic] Nero and a bad person and that he needed to do something to this fellow,” id. at 30; or, as he puts it again "That he also believed that Mr. Casey was an evil man, the Roman Emperor Nero reincarnated, a man who raped a woman and who set fires in California.” Id. at 31.

. Pears was filed after the Magistrate Judge issued her report and recommendation (April 13, 2006) (which recommended the grant of habeas relief as to the sufficiency of evidence), and after the district court filed its order denying federal habeas relief (June 21, 2006). As the State points out, Mr. Diestel did not file an objection to the magistrate judge’s report and recommendation regarding the NGRI jury instruction. ”[W]e have adopted a firm waiver rule when a party fails to object to the findings and recommendations of the magistrate [judge].” Moore v. United States, 950 F.2d 656, 659 (10th Cir.1991).
Under our "firm waiver rule,” a party who fails to file timely objections to a magistrate *1280 judge's report and recommendation waives appellate review. Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir.2004) (internal quotation marks omitted).
The firm waiver rule, however, does not apply (1) when a pro se litigant was not notified of the time period for filing an objection and the consequences for failing to do so, (2) when the interests of justice warrant, or (3) when the party that failed to object makes a showing of plain error. See Wardell v. Duncan, 470 F.3d 954, 958 (10th Cir.2006). Here, we granted a certificate of appealability because Mr. Diestel had "demonstrate^] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong” and therefore made "a substantial showing of the denial of a constitutional right.” Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); 28 U.S.C. § 2253(c)(2)-(3). There is little doubt that such showing, bolstered by the OCCA’s Fears decision, which signifies a tactical shift in the OCCA's approach to NGRI jury instructions requires our review in the interest of justice.

. Richard Birkel, Ph.D, NAMI National Director, and Mark Hardwick, Ph.D., President, NAMI Texas, Change the Law Instead, available at http://www.namiscc.org/newsletters/February02/AndreaYates.htm.