*Carpenter v. Pallito*, No. 531-9-13 Wncv (Toor, J., Aug. 13, 2014).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
WASHINGTON UNIT
CIVIL DIVISION

| | |
|---|---|
| MICHAEL CARPENTER<br>  Plaintiff<br><br>v.<br><br><br>ANDREW PALLITO<br>  Defendant | Docket No. 531-9-13 Wncv |

RULING ON THE MERITS

Plaintiff Carpenter is an inmate in the custody of the Vermont Department of Corrections (DOC). He is currently housed in a Kentucky correctional center. He brings this suit against the Commissioner of Corrections, arguing that his out-of-state incarceration violates his right to Equal Protection and the Common Benefits Clause of the Vermont Constitution. Trial took place on June 11. Post-trial memoranda were complete July 10. Dawn Matthews, Esq. represents Carpenter. David R. McLean represents Pallito.

Findings of Fact

The witnesses at trial were Carpenter, his fiancée Dee Morse, an expert witness named Kerry Lynn Kazura, and DOC employees Cullen Bullard and Jill Evans.

The court finds the following facts to be established by a preponderance of the evidence. Carpenter has been incarcerated for over three years. He is serving sentences for violation of an abuse prevention order, driving under the influence, violation of probation, and attempted escape. He has twin boys who are four and a half years old, Aiden and Brendan. He was at their birth, and with them daily until his incarceration. He fed them every day, and got up at night to

feed them so their mother – Dee Morse – could get some sleep. Morse testified that they were very focused on their father: "they wanted him more than me." She said he was a good father, a "natural parent" who was very bonded with the boys. He would rock them both to sleep in his arms. The children have no grandparents, and Morse has no family around except an eighteen-year-old daughter. She described her relationship with Carpenter as "close to perfect."

When Carpenter was first incarcerated, and was in Vermont, Morse brought the children to see him every week. He was able to hold them at those visits. Then Carpenter was sent by Corrections to Kentucky to serve his sentence. Morse cannot afford to travel to Kentucky so the boys can see their dad. There is no transportation subsidy offered to assist families to make visits to Kentucky. The Kentucky facility provides no video conferencing for families, such as through Skype or Facetime.

Although he was able to see his children at the courthouse on the day of trial, until that day Carpenter had not seen these four-year-old boys since they were a year old. Carpenter desperately wishes to see his children and would participate in any visitation program he was offered. Morse will bring the children to see him if he returns to Vermont.

Corrections sends inmates to Kentucky because they do not have enough space in Vermont correctional facilities. Instate capacity is for 1,600-1,700 inmates, and the average daily population is now 2,100. In the last two years, about 150 of those have been women. Currently there are 230 women.

In 1998, Corrections started sending inmates out of state to relieve the overcrowding and the related security concerns. At the time the out-of-state program began, there were sometimes three and four people in a two-person cell, and holding cells designed to hold five might at times hold twenty. It created security issues, although no details were proffered as to what those issues

were. There was also a lawsuit filed by the ACLU concerning living conditions, although no details were provided about that suit.

DOC sends only men out of state because of the numbers: there are more men to send. Even if they sent all the women out of state, it would not be a sufficient number to address the problem – and not all of the women have a sentence that qualifies them to be sent out of state. Once issues of medical concerns, release eligibility, pending court proceedings and mental health issues are taken into account, there are currently only 6 to 12 women eligible to be sent out of state. There is no formal policy that only men will be sent out of state, but DOC does not consider it "financially feasible" to send women elsewhere. Testimony of Cullen Bullard, Director of Classification and Facility Designation, DOC. Some women were sent out of state at some point in the past, but the current policy is to send only men. Even if some women were sent now, it would not address the overcrowding because the spaces would be in the women's facility and would not open up slots for men. Mr. Bullard testified that there are currently twenty to thirty people sleeping on cots that slide under other beds "because we don't have enough space."

The criteria to be sent out of state are that you must be serving a sentence, cleared medically, cleared for mental health issues, not be involved in any programming, and not be eligible for the work camp. There was no evidence that these criteria are statutorily mandated. It appears that they are criteria that DOC has established internally.

It is DOC's policy to try to keep inmates as close to their families as possible. In doing the screening, however, Corrections does not ask whether the inmate has minor children. Bullard testified that if Corrections took into account the inmates' desire to see their children, they would not have enough men to send out of state because they are already struggling to find more men to transfer. However, Bullard did not know how many of the inmates in Kentucky (or

other out-of-state facilities) are fathers of minor children or how many would seek visitation if it was available. He does not know how many men have made requests for contact with their children.

There is no current move towards building another correctional facility in Vermont, although that would appear to be the obvious solution. There was no evidence – other than a general statement about it being politically challenging – about what efforts have been made to build a new facility in Vermont. DOC has looked for out-of-state facilities that are closer geographically, but without success.

Jill Evans is the Director of Women and Family Services for Corrections. She focuses on issues related to children and families impacted by incarceration. She is familiar with the programs within Corrections for parents. She oversees a program at the Chittenden facility for women and children called Kids Apart. The program for mothers is aimed at building healthy bonds with children and trying to decrease the negative impacts of incarceration on the children. In Governor Shumlin's 2011 budget address he stated that moving the women from elsewhere in the state to the Chittenden County facility – a county in which "roughly one third" of them live – would "help mothers bond with their children" and "learn better parenting skills for when their time is up and they are reunited with their families." Exhibit 2. Because all female inmates are currently housed at the Chittenden facility, all female inmates have access to visitation programs.

The Nurturing Fathers Program run for fathers by Prevent Child Abuse Vermont is a parenting skills program available in some of the other Vermont facilities. It is a popular program. In addition, volunteers have offered father-child visitation in some of the facilities, separate from the standard visitation that is available. There is no standard program for men throughout Vermont; each facility sets up its own programs.

4

According to Evans, children with a mother in prison are at greater risk than children with a father in prison. She draws this conclusion from the fact that fewer children live with their fathers while mom is in jail than live with their mothers while dad is in jail. Children are twice as likely to be placed in foster care when a mother goes to prison as when a father goes to prison. Most of the women in jail in Vermont were single mothers, so the children are separated from their only caregiver.

However, Corrections keeps no statistics on how many inmates are parents. They just completed a study entitled Vermont Inmate Family Survey, dated April 2014. Ex. A. The goal was to learn how families are impacted by incarceration. Only in-state inmates were surveyed, however, and only 25 percent of them. Evans plans to do a similar survey of out-of-state inmates. The report shows that for 83 percent of male inmates in Vermont, the children live with their mother while the father is in jail, whereas for only 32 percent of female inmates are the children living with their father.

The report also states, among other things, the following: 64 percent of the inmates interviewed were parents of minor children; before incarceration, 41 percent of the children were living with the incarcerated parent; prior to incarceration, 81.6 percent of the children either lived with or regularly visited with the incarcerated parent; "a released inmate is much less likely to recidivate with a strong family connection and support system"; "contact between incarcerated parents and their children during incarceration and immediately following release has been linked to reductions in recidivism"; about 20 states have or are planning to have video-conferencing for families of inmates. Report at 33, 37, 38, 9, 3, 68.

Visitation with fathers can be complicated, because they are more likely than the women to be incarcerated for violent crimes such as domestic assault. Thus, victim advocates and others

concerned with the children need to be involved. However, Evans sees visitation in the correctional setting as a perfect time to provide safe, supervised contact and a way for such men to learn new skills. In addition, contact with their children can be a great motivator to participate in programming.

Evans testified that there is supposed to be a program set up to allow men in Kentucky to have contact with their families through Skype. She does not know why that has not happened yet, except that she understands there have been "technical issues."

DOC does not know how many male inmates who are currently out of state have minor children or how many would choose to have visitation if they were in Vermont. Evans guesses that about half the men in Kentucky are fathers, which is the percentage in-state. She did not address whether that referred to minor children or not. She would like to see parenting programs for all inmates. She believes that children should have contact with their incarcerated parents if it is in the children's best interests.

Dr. Kerry Lynn Kazura is the Chair of the Department of Family Studies at the University of New Hampshire. Her thesis was on the topic of father-child attachment, and she teaches child development. In addition to attachment, she specializes in the issue of visitation with incarcerated parents. She has done research through the Family Connection Center, which has programs in all New Hampshire prisons. The program provides parenting classes, records CDs of incarcerated parents reading books for their children, and runs visitation programs that include Skype visitation. Kazura has published articles in the journals Incarceration Today, Offender Rehabilitation Journal, and Children of Incarcerated Parents.

In Kazura's view, although there may well be a higher number of women who are children's primary caretakers, "because more men are incarcerated, there's actually more men

who were single fathers and the primary caregivers that are incarcerated and more children who are impacted from that than [from women being incarcerated]." When incarcerated parents maintain connection with their children it leads to greater self-esteem for the children and less aggressive behaviors at school. Having fathers involved in a child's life in general – not just when incarcerated – reduces the risk of teenage pregnancy and increases self-esteem.

National data shows that when inmates have visitation with their children, they behave better in prison, are more likely to get a fulltime job upon release, are less likely to commit new crimes, and are less likely to use illegal drugs.

In the New Hampshire program, inmates have to go through a four to six week parenting program and then four sessions of a support group before visitation starts. The visitation is through Skype. Only a small percentage of the inmates, male or female, actually get to the Skype portion of the program. Out of 500 inmates, Kazura would expect ten to actually get to the Skype sessions. Some parents decline visitation – whether Skype or in person – because they do not want their children to see them in prison.

Other states have various types of visitation programs. Oregon and California have special visitation centers. Virginia uses Skype. Pennsylvania buses families for visits. New York has family centers in all facilities similar to New Hampshire. Even at Sing-Sing, they have a children's playroom. Most states started with programs only for women but have moved to both men and women.

<u>Conclusions of Law</u>

Carpenter asserts that because his incarceration in Kentucky effectively prohibits him from any contact with his young children, it violates the federal Equal Protection Clause and the Vermont Common Benefits Clause. He argues that DOC is treating fathers differently from

7

mothers, and that this gender-based distinction requires DOC to prove an "exceedingly persuasive" justification for the differing treatment. United States v. Virginia, 518 U.S. 515, 533 (1996). He also argues that under the Common Benefits Clause, DOC must show an "appropriate and overriding public interest" to support its policy. Baker v. State, 170 Vt. 194, 206 (1999) (citation omitted). He seeks a declaration that the DOC policy is in violation of law, and an order returning him to Vermont.

DOC responds that the out-of-state transfers are not discrimination on the basis of gender, and that men and women are not similarly situated. It further argues that the differences in the impact on families when men and women are incarcerated, as well as the need to manage the prison population, justify the different treatment. Finally, DOC argues that there is no constitutionally protected right to visitation. It takes the position that "by violating the law, Plaintiff has lost whatever protections the Common Benefits [Clause] may provide to the extent they are incompatible with his status as an inmate." Response at 6 (filed July 10,2014).

It is worth noting here that  Carpenter is not presenting a due process claim. Rather, his focus is on how he has been treated relative to other inmate parents of a different gender. Although what is at issue here is not a regulation per se, the DOC policy of sending only men out of state is,  for all practical purposes, equivalent to a regulation barring all contact with the inmates' minor children. The court sees no reason to analyze it differently merely because it stems not from a "regulation" but an apparently unwritten  "policy." *Accord*, Johnson v. California, 543 U.S. 499, 508 (2005) (analyzing prison's unwritten policy).

Equal Protection

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84 (1987). "It is settled that a prison inmate 'retains

those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" Id. at 95 (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974).

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" by the government. City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985). The standard applied by the courts in determining whether this directive has been violated depends upon the nature of the classification between groups. "For a gender-based classification to withstand equal protection scrutiny, it must be established at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." Tuan Anh Nguyen v. I.N.S, 533 U.S. 53, 60 (2001)(citations and quotation marks omitted). *See also*, State v. George, 157 Vt. 580, 585 (1991)("Where the alleged discrimination is based on gender, courts scrutinize the . . . classification by the higher standard of whether it is 'substantially related' to an important and legitimate state interest.")(citation omitted); Ashann-Ra v. Com. of Virginia, 112 F. Supp. 2d 559, 570 (W.D. Va. 2000)(discussing the various analyses to be applied depending on the nature of the classification).[1]

Although historically it has more often been women who were denied the same benefits as men, it is no less a violation of the law to unjustifiably deny benefits to men. Mississippi University for Women v. Hogan, 458 U.S. 718 (1982)(excluding men from nursing school violated equal protection); Orr v. Orr, 440 U.S. 268, 279 (1979)(imposing alimony obligation

---

[1] This is in comparison to the four-part test used to analyze inmates' equal protection claims that are *not* based upon race or gender. That test asks (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives" to the policy or regulation. Turner v. Safly, 482 U.S. 78, 89-90 (1987).

on husbands but not wives violated equal protection). Thus, for example, another court has ruled that strip-searching male inmates in front of other detainees, while giving female detainees privacy, was an equal protection violation. <u>Young v. County of Cook</u>, 616 F. Supp. 2d 834, 852-54 (N.D.Ill. 2009)("logistics" cannot justify such a policy).

The court begins with what the facts show. The court rejects DOC's argument that male and female inmates are not "similarly situated." The evidence demonstrates that in Vermont, male inmates who are parents of minor children[2] are treated differently from female inmates who are parents of minor children, in that some of those men are sent to locations where visitation with their children is, for all practical purposes, impossible.[3] No female inmates are being treated in this manner. Not all men are either, but the result of DOC's policy of not considering parental status at all is that only male parents are sent hundreds of miles away from their children.

The proffered reason for this policy of treating men and women differently is that it is the easiest way to reduce the overcrowding in the prisons, and that there are just not enough "qualified" women to fill the needed number of out-of-state beds. To a lesser extent, DOC seeks to explain the differences between how it treats men and women on the basis of statistics about how many fewer men are likely to be the sole custodians of their children than are women.

The Supreme Court has described the analysis a court must apply in analyzing such justifications:

> [T]he reviewing court must determine whether the proffered justification is exceedingly persuasive. The burden of justification

---

[2] Although it has not been spelled out, the court interprets the claim here as relating to parents of minor children, not adult children.

[3] In theory, if the family was wealthy enough, and had vacation time enough, to fly to Kentucky and stay in a hotel, visitation might be possible. Likewise, if the children were older teenagers, they might be able to visit on their own. It is also possible that someone incarcerated for a crime in Vermont might be from Kentucky or nearby, and thus have their children close by. However, no evidence was presented that any of the out-of-state inmates have such family members. Thus, the court proceeds based on the facts before it, involving a Vermont resident whose family lives here and cannot afford to travel.

> is demanding and it rests entirely on the State. The State must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

U.S. v. Virginia, 518 U.S. 515, 533 (1996) (citations and quotation marks omitted). This is what is elsewhere referred to as "intermediate scrutiny," as opposed to the "strict scrutiny" that is applied to racial classifications. Cohen v. Brown University, 101 F. 3d 155, 183 n.22 (1st Cir. 1996). "[G]ender classifications that rest on impermissible stereotypes violate the Equal Protection Clause, even when some statistical support can be conjured up for the generalization." J.E.B. v. Alabama, 511 U.S. 127, 139 n.11 (1994).

The "relationship between parent and child is constitutionally protected." Quilloin v. Walcott, 434 U.S. 246, 255 (1978). "[T]he right of a parent to custody and the liberty interest of parents and children to relate to one another in the context of the family, free of governmental interference, are basic rights protected by the United States Constitution." In re S.B.L., 150 Vt. 294, 303 (1988)(quotation marks omitted). The Unites States Supreme Court has noted that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65 (2000). "Both the right of a parent to custody and the liberty interest of parents and children to relate to one another in the context of the family, free of governmental interference, are basic rights protected by the due process clause of the Fourteenth Amendment to the United States Constitution." Guardianship of H.L., 143 Vt. 62, 65 (1983).

On the other hand, "[m]any of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper

incarceration. And, as our cases have established, freedom of association is among the rights least compatible with incarceration. Some curtailment of that freedom must be expected in the prison context." Overton v. Bazzetta, 539 U.S. 126, 131 (2003) (citation omitted). Moreover, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Id. at 132.

Prisons may restrict inmates' contact with their children when there are "legitimate penological objectives" behind the restrictions. Caraballo-Sandoval v. Honsted, 35 F. 3d 521, 525 (11th Cir. 1994). *See also*, Phillips v. Thurmer, No. 08–cv–286–bbc, 2009 WL 1252002, at *2, *4 (W.D.Wis., April 30, 2009)(Although "prisoners retain a right to familial association during incarceration" and "[o]rdinarily, building strong connections with family members is encouraged as an aid in rehabilitation and reintegration to society," restriction on sex offender's visits with niece "bears a connection to legitimate penological interests in safety and rehabilitation"); Dunn v. Castro, 621 F. 3d 1196, 1205 (9th Cir. 2010) ("[W]e do not hold or imply that incarceration entirely extinguishes the right to receive visits from family members. Nor do we deprecate the value of the relationship between Dunn and his children. The relationship between a father or mother and his or her child, even in prison, merits some degree of protection.") (citation omitted)).

In Overton, the prison had placed restrictions on (although not barred) visitation by inmates' children, because prison resources had been strained by increased visitors and officials had "found it more difficult to maintain order during visitation and to prevent smuggling or trafficking in drugs." 539 U.S. at 129. In addition, "[s]pecial problems were encountered with the increase in visits by children, who are at risk of seeing or hearing harmful conduct during visits

and must be supervised with special care in prison visitation facilities." Id. The Court upheld the restrictions because their purpose was "maintaining internal security and protecting child visitors from exposure to sexual or other misconduct or from accidental injury." Id. at 133. The Court also noted that visitation was "limited, not completely withdrawn." Id. at 135.

The Supreme Court has also held that denying detainees "contact visits" – as opposed to contact where "clear glass panels separated the inmates from the visitors, who visit over telephones" – can be justified by security concerns: "the Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility." Block v. Rutherford, 468 U.S. 576, 578 n.1, 589 (1984).

Likewise, prisons may put restrictions on visitation for reasons such as discipline or protection of the visitors. While "courts and commentators have observed that visitation may significantly benefit both the prisoner and his family. . . . the Constitution allows prison officials to impose reasonable restrictions upon visitation." Wirsching v. Colorado, 360 F.3d 1191, 1198 (10th Cir. 2004). In Wirsching, the Tenth Circuit addressed restrictions on Mr. Wirsching's contact with his children. The court acknowledged that "the interests Mr. Wirsching asserts are important ones. The Supreme Court has held that 'parents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children.'" Id. (citation omitted). However, the court upheld the admittedly "harsh" restriction barring the inmate from seeing his daughter, which was based on his status as an untreated sex offender. Id. at 1200-02.

Some cases have held that there is no absolute right to visitation in prison, but have noted that if a ban on visitation were permanent, their conclusions might have been different. *See, e.g.*,

13

Dunn v. Castro, 621 F. 3d 1196, 1203-04 (9th Cir. 2010); Overton, 539 U.S. at 137. *Accord*, Alkebu-Lan v. Kane, No. C 06–5991 CW (PR), 2009 WL 1578722, (N.D. Cal. June 4, 2009)(indefinite ban on visitation raises due process concerns); *see also*, Laaman v. Helgemoe, 437 F. Supp. 269, 322 (D.N.H. 1977)(denying all visitation would violate "First Amendment rights to familial association" as well as Eighth Amendment rights); Valentine v. Englehardt, 474 F. Supp. 294, 302 (D.N.J. 1979)(by denying all visitation, jail denied inmates and their children "one of the most fundamental of all human rights.").

This case, however, is not about whether DOC may place express restrictions on visitation for specific penological reasons.[4] In this case, neither security, nor discipline, nor protection of the children is offered as a justification for cutting off contact with Carpenter's children. Most importantly, the cases above did not involve the issue of gender discrimination that is presented in this case. They addressed the rights to parental contact, or to visitation, but not the right to be treated similarly to the opposite gender in connection with those rights. Thus, the cases above applied the lower level of constitutional scrutiny under Turner.

Nothing specific to Carpenter, his behavior in prison, or his offense is keeping from his children. The only reason he can have no contact with his children, while other inmates can have such contact, is that he is a man. Under the higher level of scrutiny applicable to gender classifications, the court must ask whether "the [challenged] classification serves important governmental objectives and [whether] the discriminatory means employed are substantially related to the achievement of those objectives." Tuan Anh Nguyen v. I.N.S, 533 U.S. 53, 60

---

[4] It is also not about whether prisoners have a constitutional right to visitation in general. At least one court has expressly held that "there is no constitutional right to prison visitation, either for prisoners or visitors." White v. Keller, 438 F. Supp. 110, 115 (D.Md.1977), *aff'd*, 588 F.2d 913 (4th Cir. 1978) (per curiam). Others disagree. *See, e.g.*, Laaman v. Helgemoe, 437 F. Supp. 269, 322 (D.N.H. 1977)(denying all visitation would violate "First Amendment rights to familial association" as well as Eighth Amendment rights); Valentine v. Englehardt, 474 F. Supp. 294, 302 (D.N.J. 1979)(by denying all visitation, jail denied inmates and their children "one of the most fundamental of all human rights.").

(2001)(quotation marks omitted). The government's justifications must be "exceedingly persuasive." Virginia, 518 U.S. at 533. "The burden of justification is demanding and it rests entirely on the State." Id.

The objective to which DOC points is reducing overcrowding in the Vermont prisons, because of security concerns. This is obviously a valid goal, and the court accepts DOC's general proposition that at some point overcrowding can lead to security problems. However, no evidence was presented beyond that broad generalization: no testimony about the level of overcrowding at which violence increases, or illness begins to spread, or contraband is more easily exchanged, or the like. There was no evidence about research concerning ideal numbers of inmates per cell, or per facility.

Nor was any detailed evidence presented about the level of overcrowding that would exist if the out-of-state transfers stopped, such as how many inmates would be in a cell together. While there was evidence about overcrowding in the 1998 time frame, there was no evidence about how many cells now exist. The only figures given were that the current design capacity in the Vermont facilities is for 1,600 to 1,700 inmates and there are, on average, 2,100. Based on those numbers, there are only 400 to 500 "extra" inmates. If they all remained in Vermont, that would mean adding an extra person to only one of every three or four cells. Even if one subtracts the 150 average yearly number of women from the total cells available, it is still only about an extra inmate for every third male cell.

The court does not suggest that such numbers would be ideal. Nor does the court seek to micromanage the prisons or tell DOC how to do its job. However, the burden here is on DOC to be "exceedingly persuasive." There was just no concrete evidence presented that such numbers would create a real security problem. We know there are currently twenty or thirty inmates

"sleeping on cots," yet there was no evidence that they have caused any security problems. We have no evidence about the number of men that might have to return to Vermont if visitation were considered. With such a dearth of evidence, the court concludes that DOC has failed to meet its burden of proof.

DOC also seeks to justify its distinction between male and female prisoners on the basis of statistics about how many more women tend to be sole custodians of their children before going to prison. The court is not persuaded. First of all, there is no evidence that this was actually considered by DOC when it decided on its policy. It appears instead to be a post hoc justification. "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." <u>Virginia</u>, 518 U.S. at 533.

Second, the data provided to the court by DOC was exceedingly general and unsupported by anything in the way of research papers, expert testimony, or hard numbers. Finally, one cannot help but note that it is just this sort of assumption about women's roles that has, in the past, led to discrimination in the workplace *against* women. The fact that what DOC is doing *favors* women over men does not make it any better. To assume that *this* man is not likely to have a strong role in his children's lives because that is true of *some* men is precisely what is forbidden: the justification offered by the government "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." <u>Id</u>.[5] It appears to be "characteristic of role and gender stereotypes rather than the product of an examination of the actual needs and interests of the [men.]" <u>Glover v. Johnson</u>, 478 F. Supp. 1075, 1082 n.5 (E.D. Mich. 1979). In fact, the clear and undisputed evidence in this case is that

---

[5] "No longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas." <u>Orr</u> 440 U.S. at 280 (quoting <u>Stanton v. Stanton</u>, 421 U.S. 7, 14-15 (1975).

Carpenter had a close bond with his two young sons from the day of their birth, and was seeing them regularly while he was still incarcerated in Vermont.[6]

Another court has rejected an argument similar to that DOC proffers. In Estate of Hicks, 675 N.E. 2d 89 (Ill. 1996), a law barred unmarried fathers from inheriting from their children. The proffered justification was that fathers of illegitimate children "frequently have no meaningful personal relationship" with those children and fail to support them. Id. at 94. Thus, the theory went, it was "reasonable . . . to presume that illegitimate children bear no affection for parents who fail to support and acknowledge them." Id. The court rejected that explanation, because the result could be reached in a gender-neutral manner, by requiring evidence of a relationship between the particular father and child. Id. at 94-95.[7] The same is true here: individual assessments can be made about an inmate's status as parent of a minor child, or even the role he has played in the child's life, before he (or she) is sent out of state. A categorical line making broad assumptions about the role of men and women as parents is not justified.

Even if the "justification" element of DOC's burden of proof had been established, however, the State must also show that the "discriminatory means employed" to meet the objective are "substantially related to the achievement of those objectives." Tan Anh Ngyuen, 533 U.S. at 60. While sending men out of state does directly address the objective of reducing the population, sending men *who are parents of minor children* does not. DOC does not know how many out-of-state male inmates have minor children, or how many would choose to have visitation if they were in Vermont. It could be only five or ten men for all they know, because

---

[6] Surely it is to society's benefit to nurture and support loving bonds between inmates and their children, for the sake of the men, the children, and society as a whole. As witnesses for both sides agreed, contact with families can improve behavior both in prison and upon release. Although there was no specific evidence presented on the issue, and it is thus not a basis for the court's decision today, the court also notes that the lifelong importance to children of creating attachment bonds at an early age is well known.

[7] That court applied the heightened "strict scrutiny" standard of analysis, but its point is nonetheless applicable here.

they have never asked. Yet by not asking, they are barring all such men from seeing their children. There is no evidence that the number of such men, if they were brought back to Vermont, would impact DOC's proffered security concerns. It is just not persuasively established that sending men out of state regardless of their parental status is necessary to achieve DOC's goals.[8]

### Common Benefits Clause

The Common Benefits Clause of the Vermont Constitution, Article 7, states as follows:

> That government is, or ought to be, instituted for the common benefit, protection, and security of the people,  nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community; and that the community hath an indubitable, unalienable, and indefeasible right, to reform or alter government, in such manner as shall be, by that community, judged most conducive to the public weal.

"[A]t its core the Common Benefits Clause expressed a vision of government that afforded every Vermonter its benefit and protection and provided no Vermonter particular advantage." Baker v. State, 170 Vt. 194, 208-09 (1999). "Article 7 guarantees the right of the people to a government that does not favor any one person or family over another. Government is not for the chosen few. It acts constitutionally only when it benefits and protects all people equally." In re Town Highway No. 20, 2012 VT 17, ¶ 32, 191 Vt. 231.

The Vermont Supreme Court has rejected the multi-tiered analysis used in federal equal protection cases in favor of "a relatively uniform standard." Baker v. State, 170 Vt. 194, 212 (1999). The Court has described the analysis as follows:

---

[8] DOC also argues that decisions about where it places inmates are solely within its discretion. *See, e.g.*, Daye v. State, 171 Vt. 475, 479 (2000); Olim v. Wakinekona, 461 U.S. 238, 245-46 (1983). That is true as a general matter, but it does not mean DOC is immune from the mandates of the Constitution. Surely DOC would concede that despite its placement discretion, it could not place all black inmates in one facility and all whites in another. *See* Johnson v. California, 543 U.S. 499 (2005).

When a statute is challenged under Article 7, we first define that "part of the community" disadvantaged by the law. We examine the statutory basis that distinguishes those protected by the law from those excluded from the state's protection. . . .

We look next to the government's purpose in drawing a classification that includes some members of the community within the scope of the challenged law but excludes others. Consistent with Article 7's guiding principle of affording the protection and benefit of the law to all members of the Vermont community, we examine the nature of the classification to determine whether it is reasonably necessary to accomplish the State's claimed objectives.

We must ultimately ascertain whether the omission of a part of the community from the benefit, protection and security of the challenged law bears a reasonable and just relation to the governmental purpose. Consistent with the core presumption of inclusion, factors to be considered in this determination may include: (1) the significance of the benefits and protections of the challenged law; (2) whether the omission of members of the community from the benefits and protections of the challenged law promotes the government's stated goals; and (3) whether the classification is significantly underinclusive or overinclusive. As Justice Souter has observed in a different context, this approach necessarily "calls for a court to assess the relative 'weights' or dignities of the contending interests."

Id. at 212-14 (citation omitted).

Under this analysis, the court reaches the same conclusions as under the Equal Protection Clause. As noted above, the significance of the benefits of the classification has not been persuasively established; the evidence does not show that making it impossible for male inmates to see their minor children rationally advances any goal of the government; and sending men out of state without considering their parental status is an overinclusive classification. Thus, the court finds that the DOC policy of sending only male inmates out of state violates the Common Benefits Clause.

## The Relief Sought

Carpenter asks the court to issue a declaratory judgment, to direct DOC to return him to Vermont, and to order any other relief the court finds appropriate. DOC has not argued that the relief Carpenter seeks is inappropriate in this case. Thus, the court will grant the specific relief requested. The court does not believe it appropriate, however, to go any further – such as to order precisely how DOC should remedy the situation.[9]

## Conclusion

"The problems of administering prisons within constitutional standards are indeed complex and intractable, but at their core is a lack of resources allocated to prisons. Confinement of prisoners is unquestionably an expensive proposition." Rhodes v. Chapman, 452 U.S. 337, 357 (1981)(Brennan, J., concurring)(quotation marks omitted). As noted above, it is not this court's role to micromanage or second-guess how DOC runs its prisons. However, when necessary, courts must at times "insist that unconstitutional conditions be remedied, even at significant financial cost." Id. at 359.

DOC has not adequately proved that its differing treatment of male and female inmates meets constitutional requirements. Thus, the court cannot sanction DOC's policy of sending male inmates far from home, regardless of whether they have close bonds with their young children, while keeping all women nearby. The court does not suggest that the solution is necessarily to send women out of state, only that that the current practice of distinguishing between inmates based on gender is legally indefensible.

---

[9] DOC might, for example, be able to find a nearby facility in New York, Massachusetts, or New Hampshire that would not be so distant as to cause visitation problems for inmates from certain parts of the state; or screen all inmates based upon the age of their children or their custodial situation. These issues, however, should be left to DOC to determine.

## Order

For the reasons stated above, judgment is granted for Carpenter. The court finds that DOC's policy violates the Equal Protection Clause and the Vermont Common Benefits Clause. The court orders DOC to promptly return Carpenter to a Vermont institution where he can see his young children.

Dated at Montpelier this 13th day of August, 2014.

_____
Helen M. Toor
Superior Court Judge